# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WHITNEY BAILEY, Ph.D., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. CIV-19-1147-JD |
| ) | |
| (1) STEPHAN WILSON, ) | |
| (2) SISSY OSTEEN, ) | |
| (3) JORGE ATILES, ) | |
| (4) JARROD NOFTSGER, and ) | |
| (5) GARY SANDEFUR ) | |
| in their individual capacities, ) | |
| ) | |
| Defendants. ) | |

## FIRST AMENDED COMPLAINT

Plaintiff, Whitney Bailey, Ph.D. ("Plaintiff"), for her causes of action against Defendants Stephan Wilson ("Wilson"), Sissy Osteen ("Osteen"), Jorge Atiles ("Atiles"), Jarrod Noftsger ("Noftsger"), Gary Sandefur ("Sandefur") (collectively, "Defendants"), alleges and states:

## THE PARTIES

1. During the relevant times herein mentioned, Plaintiff was and now is a resident of the City of Stillwater, Payne County, State of Oklahoma, which is located within the Western District of Oklahoma.

2. During the relevant times herein mentioned, Wilson was employed by The State of Oklahoma, ex rel., The Board of Regents of Oklahoma Agricultural and Mechanical Colleges, aka Oklahoma State University ("OSU").

3. During the relevant times herein mentioned, Osteen was employed by OSU.

4. During the relevant times herein mentioned, Atiles was employed by OSU.

5. During the relevant times herein mentioned, Noftsger was employed by OSU.

6. During the relevant times herein mentioned, Sandefur was employed by OSU.

7. At all relevant times herein mentioned, OSU was and now is a constitutional agency of the State of Oklahoma with its principal place of conducting its educational business is the City of Stillwater, Payne County, State of Oklahoma.

## JURISDICTION AND VENUE

8. This Court has both personal jurisdiction over the parties as well as subject matter jurisdiction.

9. Venue is properly laid in the Western District of Oklahoma because some or all of the facts giving rise to this lawsuit occurred within the Western District of Oklahoma.

## FACT ALLEGATIONS

10. Plaintiff is employed by OSU as an Associate Professor in the Human Development and Family Science Department ("HDFS"). HDFS is one of three departments within OSU's College of Human Sciences.

11. Wilson is the Dean of the College of Human Sciences and reports to Sandefur. Wilson was and is responsible for all personnel decisions in the College of Human Sciences.

12. Osteen is the Department Head of HDFS and reports to Wilson. Osteen was and is responsible for all personnel decisions in the College of Human Sciences and during the timeframe giving rise to this lawsuit, was Plaintiff's immediate supervisor.

13. Atiles is Associate Dean of Extension & Engagement within the College of Human Sciences and reports to Wilson. Atiles oversees the Cooperative Extension unit where Plaintiff held a partial assignment for many years. Atiles was and is responsible for making decisions directly relating to Plaintiff's work and compensation as it relates to Plaintiff's Cooperative Extension Service Work.

14. Noftsger is the Assistant Department Head of HDFS and reports to Osteen. Noftsger oversees many teaching and class assignment decisions. Noftsger was and is responsible for specific HDFS teaching assignments.

15. Sandefur is the Provost and Senior Vice President of Academic Affairs at OSU. Sandefur is responsible for making certain final decisions on various intra-University appeals, including but not limited to Reappointment, Promotion, and Tenure decisions.

16. Plaintiff is a registered Republican.

17. Wilson, Osteen, Atiles, Noftsger, and Sandefur are all registered Democrats.

18. Wilson has publicly expressed his virulent dislike of President Trump. Indeed, Wilson has aggressively derided and criticized any person or group that aligns with President Trump and his administration. During the times relevant for Plaintiff's First Amendment claim herein, Wilson promoted, shared, and/or disseminated some of these specific ideas:

    A. "Mexico agrees to pay for Trump's psychiatric care";

    B. ""Spread[ing] the shame" of then-governor Mary Fallin;

    C. ""White people can see Big Foot, Loch Ness Monster, aliens, Jesus in toast…But can't see a fascist dictator developing before their very eyes";

D. That President trump is a "racist" and that he is "sick and tired of having a BIGOT as President";

E. That President Trump is similar to Adolf Hitler because he "discredit[s] the media", "silence[s] scientists and government employees", and may continue to imitate Hitler going forward because "hate crimes against minorities grew to the highest in their country's history…", Trump wants to "restore traditional values", and ultimately will deem "minorities, including gays, the disabled, non-Christians, and people of color as 'inferior'" and send those people "to death camps for slaughter";

F. That President Trump has a "lack of moral leadership";

G. That "our sons deserve better than Donald Trump's example of 'manhood'";

H. That Wilson is in direct opposition to the idea that Trump supporters have a right to vote. In reference to those who approve of President Trump, Wilson has shared and/or supported the opinion that "this is the trouble with democracy…EVERYONE gets to vote";

I. That Oklahoma's Republican "Senators [Inhofe and Lankford] are still masters of hypocrisy…"

J. That "no man has done more in recent years to undermine the functioning of U.S. government than Mitch McConnell"";

K. That Trump "blame[s] Obama for promises [Trump] can't keep";

L. That there is a "perverse reality of the Republican health care bill";

> M. That "in keeping with the new spirit of America, I removed all the Jews, Arabs, Africans and immigrants from my Nativity scene";
>
> N. "White Christians who voted for Donald Trump: fix this now";
>
> O. ""Trump is a demagogue who vilifies and scapegoats refugees, Muslims, undocumented immigrants, racial minorities…";
>
> P. That President Trump is a "tyrant" who "control[s] the press"; and
>
> Q. That President Trump would select notorious drug kingpin "El Chapo" to run the Drug Enforcement Agency.

19. Wilson has a myriad of other social media posts that readily demonstrate his disdain for President Trump, Republicans, and anyone that aligns with President Trump and his administration. Wilson has made his opposition of the Trump Administration and Republican ideals well known to the public.

20. Wilson's publicly stated disdain, along with some of the specific examples in Paragraph 18, *supra*, includes the President's appointees, specifically including the leadership and practices of the U.S. Department of Health & Human Services. Wilson has also been highly critical of the Trump Administration in general, those who voted for President Trump in 2016, and those who appear inclined to vote for President Trump again in 2020.

21. Wilson publicly shared many of these aggressive opinions during the same time that he made critical employment decisions for Plaintiff as described herein.

22. Upon information and belief, Atiles has been highly critical of the Trump Administration's decision to relocate the National Institute of Food and Agriculture of

the United States Department of Agriculture from Washington, D.C. to Kansas City, Missouri effective October 1, 2019. Atiles has also been highly critical of the Trump Administration in general, those who voted for President Trump in 2016, and those who appear inclined to vote for President Trump again in 2020. Atiles conveyed these beliefs and criticisms during the same time that he made critical employment decisions for Plaintiff as described herein. During the time relevant for Plaintiff's First Amendment claim, Atiles supported and spoke at an event called "Nation Divided" sponsored by OSU's Gender and Women's Studies Department.

23. Upon information and belief, Osteen has been highly critical of the Trump Administration in general, those who voted for President Trump in 2016, and those who appear inclined to vote for President Trump again in 2020. Osteen conveyed these beliefs and criticisms during the same time that she made critical employment decisions for Plaintiff as described herein.

24. Upon information and belief, Noftsger has been highly critical of the Trump Administration in general, those who voted for President Trump in 2016, and those who appear inclined to vote for President Trump again in 2020.

25. Noftsger, among other things, has referred to purportedly conservative principles as "why we can't have nice things", has compared at least one member of the Trump Administration to a fictional movie villain, and has shared opinions that President Trump will threaten the freedoms and beliefs of the LGBT community. Noftsger shared these opinions during the same time that he made critical employment-related decisions for Plaintiff as described herein.

26. Upon information and belief, Sandefur has been highly critical of the Trump Administration in general, those who voted for President Trump in 2016, and those who appear inclined to vote for President Trump again in 2020. Sandefur shared these opinions during the same time that he made critical employment-related decisions for Plaintiff as described herein.

27. Following President Trump's election in November 2016, OSU's administration offered counseling assistance to the entire OSU community who were having difficulty dealing with Trump's election as President of the United States. This offer of counseling assistance also directed the OSU community to OSU's "Office of Multicultural Affairs". This offer of counseling assistance was disseminated to the OSU community in an email labelled as "important" from President Burns Hargis two days after the 2016 Presidential Election on November 10, 2016 at 9:53 AM. Upon information and belief, no similar messages offering counseling services were disseminated to the OSU Community following the 2008 or 2012 Presidential Elections, which were victories for Barack Obama, a Democrat.

28. Based on Plaintiff's academic credentials, expertise, and professional network in Adulthood and Aging, she was appointed by President Donald J. Trump to serve in his administration following President Trump's election. Plaintiff served as a member of the Senior Executive Service within the U.S. Department of Health & Human Services from December 10, 2017 to January 5th, 2019, taking Leave Without Pay from OSU to do so. The U.S. Department of Health & Human Services houses entities such as the

National Institutes of Health, the Centers for Disease Control, the Administration on Children and Families, and Indian Health Services.

29. On December 6, 2016, Plaintiff held the first of many meetings with various OSU administrators to discuss the possibility that she would be tapped to serve within the Trump administration. On December 6, 2016, Plaintiff met with Denise Weaver (Sandefur's Executive Assistant) of OSU's Academic Affairs Office to discuss OSU's policies and procedures that would align with extended leave for faculty (such as Plaintiff joining the Trump Administration) who are sought to contribute their expertise outside of OSU without permanently separating from OSU.

30. On or around September 16, 2016, Plaintiff submitted the first of several documents to OSU administrators to initiate her application for promotion to Professor. The September 16, 2016 document reflected Plaintiff's decision not to waive her rights to external review letters submitted as a part of the OSU promotion process.

31. On or around October 3, 2016, Plaintiff submitted her dossier for external review on the requested promotion with OSU.

32. On or around January 10, 2017, Plaintiff submitted her dossier for internal review on the requested promotion with OSU.

33. Defendants Wilson, Osteen, and Sandefur disregarded OSU policies regarding Reappointment, Promotion and Tenure ("RPT") in considering the promotion request initiated by Plaintiff in September 2016. Specifically, there was a failure to follow OSU policies regarding: (1) soliciting external review letters submitted by distinguished personnel from other universities in support of Plaintiff's promotion request; (2)

coercing Plaintiff to waive her rights to view the external review letters; and (3) assessing and weighing the external letters.

34. Multiple individuals who served alongside Wilson and Osteen during the RPT process, including Robert Larzelere, then Chair of the HDFS RPT Committee and Jacque Lochmiller, then Director of Administrative Support Services for Wilson, specifically communicated to Plaintiff that choosing not to waive her rights to review the external letters would affect her ability to get a fair review. Plaintiff upheld her September 16, 2016 decision not to waive her rights under OSU policy.

35. The external review letters regarding Plaintiff's requested promotion were submitted to OSU between November 2016 and January 2017. Plaintiff received excellent reviews and all four external reviewers independently recommended Plaintiff for promotion.

36. On or around February 15, 2017, Defendant Osteen did not recommend Plaintiff for the promotion, despite a written appraisal of Plaintiff on January 9, 2017 that stated "Good work. You are making progress toward promotion.".

37. On or around March 20, 2017, Defendant Wilson did not recommend Plaintiff for promotion.

38. Plaintiff later appealed this decision and the methods that OSU's personnel used and/or failed to use for Plaintiff's promotion request.

39. Throughout the spring semester of 2017, Plaintiff and Osteen had ongoing conversations about the likelihood of Plaintiff's service for the Trump Administration and ways to maintain Plaintiff's many projects during said leave.

40. On May 19, 2017, the Faculty Committee of Faculty Council (which none of the Defendants were on) voted 6-2 in Plaintiff's favor to grant Plaintiff's promotion request to be submitted to Sandefur as an opinion.

41. On June 16, 2017, Plaintiff, Osteen, and Atiles discussed in greater detail the Plaintiff's likely appointment within the Trump Administration. During this conversation, Osteen and Atiles indicated their support that Plaintiff could take as much as 24 months leave without pay. Also during this conversation, Plaintiff clarified that such leave would not surrender her tenured faculty position, and both Osteen and Atiles agreed.

42. Sometime following June 16, 2017, Plaintiff contacted Wilson and Sandefur in an attempt to express her sincere interest in participating in any conversation or process whereby a resolution of Plaintiff's promotion request could be accomplished. Wilson and Sandefur refused. Sandefur cited advisement from legal counsel as his reason for not exploring possible resolution outside of the dispute resolution process. Wilson indicated that his "part of the process cannot be reversed."

43. Also in June 2017, Sandefur denied Plaintiff's promotion request.

44. On July 25, 2017, Plaintiff filed a Petition for Dispute Resolution to appeal Sandefur's denial of Plaintiff's promotion request.

45. On September 12, 2017, Plaintiff met with Osteen in Osteen's office, where they further discussed the logistics about how Plaintiff's various projects at OSU could be maintained while Plaintiff served in the Trump Administration.

46. On September 18, 2017, Plaintiff wrote a memo to Osteen in an effort to continue preparing plans for Plaintiff's leave. Plaintiff indicated to Osteen that she would like to solidify a plan that could be implemented with one to two weeks' notice.

47. A later OSU administrative review by the Committee of Three dated September 20, 2017 found that Osteen, Wilson, and Sandefur, when evaluating Plaintiff's RPT request, "distressed, confused and humiliated a valuable and productive faculty member. It disrespected and wasted the time of distinguished scholars at other schools. It involved this committee in time-consuming attempts at remediation."

48. The Committee of Three also concluded the RPT processes used in Plaintiff's case by Osteen, Wilson, and Sandefur "involve[d] a documented and systemic failure to follow university policy" and "Violation of explicit University Policy, disingenuous treatment of outside scholars, coercion of faculty to sign a waiver of access and failure to explicitly assess and weigh available outside peer letters as a part of the RPT process are all made plain in Whitney Bailey's RPT process for promotion to Professor."

49. The Committee of Three also asked the question regarding Osteen's, Wilson's, and Sandefur's conduct: "Would we want our academic peers to know how we treat faculty and external reviewers?"

50. The Committee of Three provided several suggested remedies following the conduct of Osteen, Wilson, and Sandefur that should have included "University Legal Counsel refreshing appropriate administrators of University policy. The President should require that Whitney Bailey should have her case reviewed again by the Provost in light of the peer review letters and the recommendation of the Faculty Committee of the Faculty

Council, which did review the letters. She should either gain a promotion or an explanation as to what exactly is required other than 'more time' and 'the near future.'"

51. After reviewing the record of the actions regarding Plaintiff's promotion request, the Committee of Three also found that a Formal Dispute Resolution Hearing was warranted.

52. Despite the fact that OSU's Committee of Three rebuked the decisions and actions of Osteen, Wilson, and Sandefur, who disregarded OSU policies and "distressed, confused and humiliated" Plaintiff, the Dispute Resolution Committee affirmed the decision to not grant Plaintiff's promotion request.

53. Despite the fact that Osteen, Wilson, and Sandefur disregarded OSU policies and "distressed, confused and humiliated" Plaintiff and that the Committee of Three urged a reconsideration of Plaintiff's RPT request, Sandefur affirmed the decision to not recommend Plaintiff for the promotion. Sandefur communicated this final finding to Plaintiff on December 8, 2017, the very last day that Plaintiff was at OSU before she left to join the Trump Administration. Indeed, Snadefur communicated this final finding to Plaintiff within the last hour of Plaintiff leaving that day.

54. Sandefur's December 8, 2017 affirmance represented the exhaustion of administrative remedies available to Plaintiff regarding the continued and connected course of wrongful conduct perpetrated by the Defendants that had occurred prior to that date.

55. Despite continued opportunities to undo their wrongful decisions and acts regarding Plaintiff's RPT request, Wilson, Osteen, Atiles, Noftsger, and Sandefur have continued to reaffirm their wrongful positions on this topic.

56. Plaintiff's leave without pay agreement signed by Osteen and dated December 4, 2017 was for one year, renewable for a second year with the opportunity to return to her position at OSU at the beginning of any semester, with 30 days' notice. This allowed Plaintiff to return to her OSU position as early as August 2018 or after 8 months.

57. Before taking the position as a member of the Trump Administration, Plaintiff had been a member of the OSU faculty for over 13 years and had received multiple teaching and mentoring awards, received numerous competitive grant awards, and had favorable external reviews from prestigious faculty from other universities.

58. When Plaintiff ended her leave without pay after the end of one year and returned to her faculty position at OSU in January 2019 from the Trump Administration, she was:

   A. Denied summer teaching assignments and resultant compensation for the first time since 2010 by Noftsger and Osteen.

   B. Deprived return and resultant compensation for her Cooperative Extension Service work by Atiles, Osteen, and Wilson.

   C. Denied resumption of the Bryan Close Professorship in Adulthood and Aging by Osteen and Wilson, all of which deprived and continue to deprive Plaintiff of annual income and retirement benefits.

   D. Plaintiff was also assigned to teach two courses which she had never taught before by Noftsger and Osteen. Plaintiff also had previously created a specialized course in her area of expertise but was not permitted to teach it upon her return by Noftsger and Osteen.

E. Further, Plaintiff faced significant difficulty and strain with Osteen and Atiles while attempting to re-enter work associated with the Clark family and the Clark Gerontology Fund, which was the work that Plaintiff established and lead prior to serving in the Trump Administration. Indeed, the wrongful actions of Osteen and Atiles aimed towards Plaintiff caused significant strain with a major donor that had previously contributed a large amount of funds to OSU relating to Plaintiff's scholarly work.

59. Wilson, Osteen, Atiles, Noftsger, and Sandefur, each of them in their specific and unique decision-making positions, had no legitimate good faith basis to deny Plaintiff's promotion or to deprive Plaintiff of the other economic benefits associated with her employment with OSU after returning from the Trump Administration. Despite continued opportunities to undo their continued wrongful decisions and acts specified herein, Wilson, Osteen, Atiles, Noftsger, and Sandefur have continued to reaffirm their wrongful positions on each of these topics.

60. Wilson, Osteen, Atiles, Noftsger, and Sandefur, each of them in their specific and unique decision-making positions, who took these actions that adversely affected Plaintiff did so willfully, intentionally, and in violation of the provisions of the 1st Amendment to the U.S. Constitution that guarantee a faculty member like Plaintiff the right of free association and expression.

61. Upon information and belief, other similarly situated OSU faculty members to Plaintiff have taken various types of leave and have returned to their previous assignments, including teaching assignments, without the issues that Plaintiff has faced as described

herein. In fact, many of these similarly situated OSU faculty members to Plaintiff have received accolades from OSU. These similarly situated OSU faculty members have been supported by Wilson, Osteen, Atiles, Noftsger, and Sandefur. None of these other similarly situated faculty members were appointed to the Trump Administration, however. The reason that Plaintiff and these other similarly situated OSU faculty members were treated differently by Wilson, Osteen, Atiles, Noftsger, and Sandefur were because of political affiliation and association.

62. OSU, Wilson, Osteen, Atiles, Noftsger, and Sandefur invest a considerable amount of time, talent and treasure generating print and electronic media to highlight accolades that faculty achieve at the state, regional, national, and international levels. However, a review of prior publications from OSU yields no results of OSU making any mention of Plaintiff's appointment to the Trump Administration. This is in stark contrast to prior highlights published by OSU for other accolades achieved by Plaintiff before her appointment to the Trump Administration, such as Plaintiff's multiple mentions in Oklahoma's "40 under 40" list, when Plaintiff received funding for multiple federal grants, Plaintiff's appointment as Chair of a state human services board, and for various teaching awards. In other words, OSU, Wilson, Osteen, Atiles, Noftsger, and Sandefur have taken zero pride in Plaintiff's appointment to the Trump Administration. The reason that Plaintiff's appointment to and service with the Trump Administration was not mentioned or supported in the same way as plaintiff's prior accolades by OSU, Wilson, Osteen, Atiles, Noftsger, and Sandefur was because of a political animus and/or bias towards Plaintiff.

63. Upon information and belief, Wilson, Osteen, Noftsger, Atiles, Noftsger, and Sandefur have previously and regularly personally disseminated positive information and public support regarding other similarly situated OSU faculty such as Plaintiff serving in various governmental and/or quasi-governmental positions. However, Wilson, Osteen, Atiles, Noftsger, and Sandefur never made any effort whatsoever to disseminate positive information or public support regarding Plaintiff's appointment and/or service in the Trump Administration. The reason that Plaintiff and these other similarly situated OSU faculty members were treated differently were because of a political animus and/or bias towards Plaintiff.

**FIRST CAUSE OF ACTION: VIOLATION OF THE FIRST AMENDMENT RIGHT TO FREEDOM OF ASSOCIATION BY WAY OF 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS**

64. Plaintiff incorporates ¶¶1-63 as though fully stated herein.

65. Plaintiff's political beliefs, her status as a registered Republican, and her acceptance of an appointment to the Trump Administration are forms of expression and political association.

66. Plaintiff's political beliefs, status as a registered Republican, and/or acceptance of an appointment to the Trump Administration were substantial or motivating factors in the following unlawful acts and omissions, *inter alia*:

   A. Noftsger and Osteen denying Plaintiff's summer teaching assignments and resultant compensation for the first time since 2010;

   B. Atiles, Osteen, and Wilson depriving Plaintiff's return and resultant compensation for her Cooperative Extension Service work;

C. Osteen and Wilson denying Plaintiff's resumption of the Bryan Close Professorship in Adulthood and Aging;

D. Noftsger and Osteen assigning Plaintiff to teach two courses which she had never taught before;

E. Noftsger and Osteen not permitting Plaintiff to teach a specialized course in her area of expertise that she established before her leave with the Trump Administration;

F. Wilson, Osteen, and Sandefur blatantly disregarding OSU's policies in evaluating Plaintiff's RPT request;

G. Wilson, Osteen, and Sandefur refusing to grant Plaintiff's requested promotion and resultant compensation;

H. Sandefur affirming the refusal of Plaintiff's requested promotion despite the fact that Wilson, Osteen, and Sandefur blatantly disregarded OSU's policies in evaluating that very request, which was confirmed and exposed by OSU's Committee of Three and the Faculty Committee of Faculty Council's recommendation that Plaintiff be promoted;

I. Wilson, Osteen, Atiles, Noftsger, and Sandefur treating Plaintiff differently than other similarly-situated faculty and/or employees of OSU who previously engaged in service or appointments with other governmental authorities and/or administrations in their respective fields of expertise; and

    J.    Wilson, Osteen, Atiles, Noftsger, and Sandefur treating Plaintiff's appointment to and service for the Trump Administration different from prior professional accolades given to Plaintiff not involving the Trump Administration.

67. The Defendants' wrongful acts, omissions, and First Amendment violations were not a singular incident or unlawful act with one identifiable date. The instances complained of by Plaintiff herein were not merely ill effects of previous unlawful conduct by the Defendants. Rather, Defendants' wrongful acts, omissions, and First Amendment violations were all connected, were of a continuing nature, and will continue to damage Plaintiff.

68. Plaintiff's employment with OSU did not and does not require political allegiance.

69. Plaintiff's right of political association by way of her political beliefs, her political party registration, and her acceptance of an appointment to the Trump Administration was clearly established at the time Wilson, Osteen, Atiles, Noftsger, and Sandefur each separately undertook, in their various decision-making roles, the acts and omissions described herein.

70. The unlawful conduct of Wilson, Osteen, Atiles, Noftsger, and Sandefur was motivated by evil motive or intent and involved reckless or callous indifference to Plaintiff's federally protected rights.

71. As a result of the unlawful conduct of Wilson, Osteen, Atiles, Noftsger, and Sandefur, Plaintiff has sustained economic loss as aforesaid and non-economic loss, including but not limited to mental anguish, emotional distress, humiliation, embarrassment, injury to reputation, and lost enjoyment of life in sum in excess of $75,000.00.

72. Wherefore, Plaintiff prays for judgment against the Defendants as follows:

   A. For her actual damages in a sum in excess of $75,000.00 and in accordance with the proof and as determined by the jury at the time of trial;

   B. For punitive and exemplary damages;

   C. For statutory interest thereon, both prejudgment and post judgment as allowed by law;

   D. For her costs;

   E. For a reasonable attorney's fee; and

   F. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Geoffrey A. Tabor
Stanley M. Ward, OBA#9351
Geoffrey A. Tabor, OBA #32880
1601 36th Avenue, N.W.
Norman, Oklahoma   73072
(405) 360-9700  /  (405) 360-7902 (fax)
ATTORNEYS FOR PLAINTIFF
JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED